IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BERNARD ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | 06-cv-1895 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| COUNTRY CLUB HILLS, | ) | |
| OFFICER McKINNEY (BADGE #836), | ) | |
| OFFICER JONES, and | ) | |
| UNKNOWN OFFICERS | ) | |
| OF COUNTRY CLUB HILLS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This lawsuit arises out of a May 29, 2004 visit that certain Country Club Hills police officers paid to the home of Plaintiff Bernard Ellis ("Plaintiff"), during which the officers shocked Plaintiff with a taser, handcuffed, and arrested him. Plaintiff's current complaint [57] asserts three claims against the City of Country Club Hills ("the City") and two of its police officers, an "Officer McKinney" and an "Officer Jones" (collectively, the "Defendant Officers").[1] Count I alleges that Defendant Officers used excessive force during Plaintiff's arrest. Count II alleges that Plaintiff was provided with inadequate medical treatment at the police station in violation of the Eighth and Fourteenth Amendments. Plaintiff seeks to impose liability on the City for Counts I and II under *Monell v. New York City Dep't. of Social Services*, 436 U.S. 665, 694 (1978) and its progeny, by alleging that the City's failure to properly train its

---

[1] In their answer [58], Defendants identify "Defendant McKinney" as Officer Edward McKinney and "Defendant Jones" as Officer William Jones. While Plaintiff's current complaint continues to identify certain "Unknown Police Officers" as defendants, fact discovery has long been completed and the applicable period of limitations for Plaintiff to add additional individual defendants has long since passed. See, *e.g. Eison v. McCoy*, 146 F.3d 468, 471-72 (7th Cir. 1998).

officers caused Plaintiff's rights to be violated.[2] Count III seeks indemnification from the City pursuant to an Illinois statute, 745 ILCS 10/9-102.

Currently before the Court is the City's motion for summary judgment as to Counts I and II, and as to an aspect of Count III [60].[3] For the reasons stated below, the City's motion [60] is granted.

I.  **Background**

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements:[4] The City's statement of facts [61] ("City SOF"), Plaintiff's response to the City's statement of facts [72] ("Pl. Resp. City SOF"), and Plaintiff's Statement of Additional Facts [72] ("Pl. SOAF").[5]

---

[2] Plaintiff alleges that Counts I and II claim are brought under 42 U.S.C. § 1983.

[3] The individual Defendants have not moved for summary judgment; thus, as Plaintiff notes, "[t]here will be a trial in this case against the officers" [71, at 2], unless the case is settled before trial.

[4] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact. See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

[5] The City did not respond to Plaintiff's Statement of Additional Facts. Therefore, to the extent that factual allegations in Plaintiff's Statement of Additional Facts are not directly contradicted by allegations in the City's own Statement, they are deemed admitted for purposes of this motion. See *Malec*, 191

2

### A. Police Response to a Disturbance Call

On the night of May 29, 2004, three members of the Country Club Hills Police Department responded to a 911 call at the home of Bernard and Patrice Ellis. (Pl. Resp. City SOF ¶ 4–5). Christopher Ammons, the son of Patrice Ellis and Plaintiff's stepson, had called 911 to report that Plaintiff was beating his mother, based upon the crying and the other sounds he heard coming from his mother's bedroom. (*Id.* at ¶ 7; see also Deposition of Christopher Ammons at 7–8). Defendant Officer McKinney arrived first, followed by Defendant Officer Jones and Officer Keith Burke. (*Id.* at ¶ 10). Ammons jumped out of his brother's second floor window in order to meet the officers in the driveway of the home. (*Id.* at ¶ 8). Ammons advised the officers of his belief that Plaintiff had been beating his mother, and told the police that she needed medical attention.[6] (*Id.* at ¶ 11). The officers entered the residence.

When the officers entered the residence, Plaintiff was in the bedroom of his home with his wife Patrice. (Pl. SOAF ¶ 1). Patrice's cries of pain were due to a sickle cell anemia attack that she was experiencing at that time. (*Id.*). Plaintiff went into the hallway and spoke with Officer Burke, who greeted him and said that they had received a call about a disturbance. (*Id.* at ¶ 2). Plaintiff explained that his wife was having a sickle cell anemia attack, and Officer Burke asked to see her. (*Id.* at ¶ 3). Officer Burke walked to the bedroom and spoke to Patrice, who said that she was okay, but that she had not taken her medicine. (*Id.* at ¶ 4). Patrice denied "that there was anything else going on," and refused an ambulance. (*Id.*).

---

F.R.D. at 584.

[6] While Plaintiff disputes this testimony, he cites to a deposition page which was not provided to the court. (Pl. Resp. ¶ 11). The fact is therefore deemed admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584.

Plaintiff then asked the officers to leave. (*Id.* at ¶ 5).[7] At that point, the white officer, who appears to be Officer McKinney (City SOF ¶ 22), placed his hand on his taser.[8] (Pl. SOAF ¶ 6). Plaintiff asked the officers to leave again, and they refused. The officers then informed Plaintiff that they had called an ambulance. (Pl. SOAF ¶¶ 7–8). The conversation at this point is in dispute, as are the reasons for what happened next. (See Pl. SOAF ¶¶ 7–9; City SOF ¶¶ 13–14). No one disputes, however, that the officers then shocked Plaintiff with their tasers. (Pl. SOAF ¶ 11).

One of the officers (which one is disputed) fired, and one of the taser's two probes lodged in Plaintiff's right bicep. (Pl. SOAF ¶¶ 11, 12, 13; City SOF ¶ 22). Plaintiff was shocked several times, causing him to stumble into the bedroom and fall to the ground onto his chest. (*Id.* at ¶ 13). Plaintiff was then tased repeatedly; the parties disagree as to whether this was in the back, (City SOF ¶ 15), or on Plaintiff's right arm. (Pl. SOAF ¶ 16). The shocks caused Plaintiff pain and caused him to shake uncontrollably. (Pl. SOAF ¶ 16). The shocks subsequent to the initial shock were administered in "drive stun mode." (Pl. Resp. City SOF ¶ 15). At one point,

---

[7] The level of confrontation is in dispute; while Plaintiff asserts that "voices were not raised at this point in time," (Pl. SOAF ¶¶ 5, 9), the City alleges that Plaintiff was agitated and irate (City SOF ¶¶ 12, 13).

[8] Although the parties do not describe what a taser is and what effect it has on a person against whom it is employed, the record indicates that at the time of the occurrence, Country Club Hills police officers carried the "X26" model taser. (Pl. SOAF at Ex. 4, Section II, III). The Seventh Circuit has described the X26 taser as follows: "[The] TASER X26 ECD [is] a stun device that sends an electric pulse through the victim's body causing pain, disorientation, weakness, and loss of balance. The device has two modes of firing. The first mode fires two probes that are connected to the taser gun by a high-voltage, insulated wire. When the probes make contact with the body, an electrical current passes through the surface of the body. The taser emits a current as long as the trigger is pulled or for a maximum duration of five seconds. The second method of deployment is the "drive-stun" mode. In this mode the operator presses the taser to a subject's body and then pulls the trigger to emit a current. The deployment lasts as long as the trigger is pulled or for a maximum duration of five seconds. The device contains an internal computer chip that records the date and time of every trigger pull." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 859 n.1 (7th Cir. 2010).

Plaintiff heard an officer tell the other officer to hit Plaintiff with the taser behind his ear. (*Id*. at ¶ 15).

As Plaintiff lay on the ground on his chest in his bedroom, the black officer (who appears to be Officer Jones) handcuffed him. (Pl. SOAF ¶¶ 19–20). The officer then unfolded a three-foot long nightstick, (*Id*. at ¶ 17) and struck Plaintiff with it on his arm, back, leg, the back of his neck, his shoulder, and the right rear of his head two to three times. (*Id*. at ¶ 18). Officer Jones told Officer McKinney to hit him a few more times with the stun gun, which he did about four times. (*Id*. at ¶ 21). Plaintiff was then tased on his neck, between his neck and his head, his right arm, and his back. (*Id.* at ¶¶ 21-23). One of the officers kicked Plaintiff in the groin two to three times. (*Id*. at ¶ 24). Officer Jones also kicked Plaintiff in the face three to four times. (*Id*. at ¶ 25). Meanwhile, Officer Burke, standing nearby, refused to help or respond to Plaintiff's cries for assistance. (*Id*. at ¶ 26). Finally, the officers dragged Plaintiff, still handcuffed, out of the bedroom and into the living room, where they ran him into a wall. (*Id*. at ¶ 27). After Plaintiff fell, the officers kicked him in the face and groin again, punched him in the face, stood him up, and punched him in the face again. (*Id.*).

The entire ordeal lasted approximately fifteen to twenty minutes. (Pl. SOAF ¶ 28). Plaintiff was then driven to the police station, either by a black police officer (Pl. SOAF ¶ 29), or by Officer Burke (City SOF ¶ 17). During the ride, Plaintiff gave no indication of being in pain. (City SOF ¶ 18).[9] When he arrived at the station, another officer (a Sergeant Jagman) asked Plaintiff, "Man, what happened to you?" Jagman then pulled the taser prong out of Plaintiff's

---

[9] Plaintiff attempts to rebut this point by citing to his complaint. This is not the "specific evidentiary material" required by the Rule. *See Malec*, 191 F.R.D. at 584–85; *Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006) ("[M]ere allegations of a complaint are not evidence.").

5

arm. (Pl. SOAF ¶¶ 30–31).[10] Plaintiff was bleeding from his arm and from behind his right ear. (*Id*.). Plaintiff told Jagman that the officers had "jumped [him]," but Jagman simply walked away. (Pl. SOAF ¶¶ 31–32).

### B. Taser Usage and Policies

The parties do not disagree about the evidence presented in regard to the Police Department's taser policy. Lieutenant William Garrison testified in a deposition that he, along with Sergeant Kmetty, handles the training of Country Club Hills police officers in the use of the taser. (Pl. Resp. City SOF ¶ 25). Lt. Garrison was certified as an instructor in the use of the taser in 2004, (Pl. Resp. City SOF ¶ 24), after completing eight hours of training and passing a twenty-five question test (Pl. SOAF ¶¶ 34, 36). The training that Lt. Garrison and Sgt. Kmetty provided to County Club Hills police officers included a PowerPoint presentation, drills, and the discussion of various scenarios. (Pl. Resp. City SOF ¶ 26). That training, too. was eight-hours long and culminated in a written examination. (*Id*.).

The City Police Department also has a written policy, General Order #04-01 (the "Taser Policy"), which governs the use of tasers by law enforcement personnel. (Pl. Resp. City SOF ¶ 28). Officers are expected to know and understand the Policy. (Pl. SOAF at ¶ 38). The Taser Policy itself specifically forbids the use of force as a punitive measure and forbids aiming the taser at a person's eyes, face, or neck. After deploying the taser, officers are required to evaluate the offender. If, after deploying the taser, the person is under control, an officer or supervisor at the scene may remove any taser probes that have penetrated the skin. However, officers may leave probes embedded in the offender during transportation to the police department if control of the offender is in question. Officers are instructed to have paramedics take an offender to the

---

[10] Defendant McKinney was aware that one of the taser probes was still in Plaintiff's arm while he was transported to the station; the probe was not removed at the scene. (Pl. SOAF at ¶ 50).

6

hospital if a probe strikes a sensitive area of the body and medical intervention is needed. The policy does not set forth a maximum number of stuns to be used on an offender. Each discharge of a taser is to be documented and investigated.

Lt. Garrison further testified that he instructs the officers to announce their use of the taser before firing, as the mere threat that the taser may be employed is sometimes effective (Pl. SOAF ¶ 35), and that the "use of force spectrum" proceeds in increasing order from an officer's mere presence to verbal direction from the officer, the use of soft or hard hand tactics to control movement, pepper spray, the taser, the baton, and finally, the firearm. (*Id.* at ¶ 37).[11] Each officer with the Country Club Hills Police Department must be re-certified in taser usage every twelve months. (Pl. Resp. City SOF ¶ 29). Lt. Garrison has never been involved in disciplining a Country Club Hills police officer for failure to observe the Department's policies on the use of the taser. (*Id.* at ¶ 30).

The three officers involved in the dispute each provided differing accounts of what they believed the Department's use of force policy to be, including how officers are to deploy their tasers. Officer McKinney testified that in the encounter at Plaintiff's home, he went straight from verbal direction to the taser, which he believes was in compliance with the written policy. (Pl. SOAF ¶ 45). Officer Jones testified that the Taser Policy provided that one is to use a taser before placing hands on a suspect, that the use of the taser requires two verbal warnings, and that, if a suspect is resisting arrest, the taser is used before other measures like pepper spray. (*Id.* at ¶ 44). All that Officer Burke could recall of the Taser Policy was that an officer was required to file a report after each use. (*Id.* at ¶ 46). Each of the officers agreed that tasering or kicking a fully subdued or handcuffed suspect would be improper. (*Id.* at ¶ 47).

---

[11] This "use of force spectrum" is codified in the Department's General Order #04-02.

Since the events in question, the City of Country Club Hills has discontinued the use of the taser. (Pl. SOAF ¶ 43).

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**III.   Analysis**

A municipality cannot be held vicariously liable for the acts of its employees under § 1983 on a *respondeat superior* theory. *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 120 (1992). Rather, a municipal policy or practice must be the "direct cause" or "moving force" behind the constitutional violation. See *City of Oklahoma v. Tuttle*, 471 U.S. 808, 820 (1985); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978). In other words, "it is when execution of a government's policy or custom * * * inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

That a constitutional injury was caused by a municipality may be shown directly by demonstrating that the policy itself is unconstitutional. See, *e.g. Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530–31 (7th Cir. 2000) (citing *Monell* 436 U.S. at 694-95 (holding that a municipality may be liable under § 1983 for a policy that requires pregnant women to take unpaid leave before leave was required for medical reasons because the policy itself is unconstitutional)). Municipal liability also may be demonstrated indirectly "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Id*. (quoting *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995)). A plaintiff can establish a municipal policy in one of three ways, either by "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional

injury was caused by a person with final policymaking authority." *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997).

A policy of inadequate training may serve as the basis for municipal liability under § 1983, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Courts find deliberate indifference on the part of policymakers only when such indifference may be considered a municipal policy or custom. *City of Canton*, 489 U.S. at 389 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality-a 'policy' as defined by our prior cases-can a city be liable for such a failure under [Section 1983]."). The Seventh Circuit has held that proof of deliberate indifference on the part of the municipality can take the form of either "(1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006); see also *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997). Instead, in order to prove deliberate indifference on behalf of a municipality, the Seventh Circuit "requires a high degree of culpability." *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) ("In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or training program, we require a high degree of culpability on the part of the policymaker.").

Plaintiff does not argue that the City's Taser Policy was facially unconstitutional or that Defendant Officers had final policymaking authority for the City. Instead, Plaintiff seeks to hold

the City liable by arguing that (1) the City's failure to adequately train its police officers in the use of tasers was so likely to lead to a constitutional violation that the deficiency constituted a deliberate indifference on the part of Country Club Hills, (Pl. Mem. [71] at 7-8); and (2) the lack of training similarly constitutes a deliberate indifference towards the medical needs of tased offenders, (*id.* at 13).

### A. Failure to Train Officers on Use of Tasers

Plaintiff bears the burden of proving the alleged policy, custom, or usage at trial. See *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). Therefore, to survive summary judgment, Plaintiff must set forth specific facts showing that there is a genuine issue of material fact regarding the existence of such a policy, custom, or usage. *Id.*; see also *Rodgers v. Lincoln Towing*, 771 F.2d 194, 202 (7th Cir. 1985) ("Boilerplate allegations of a municipal policy, entirely lacking in any factual support that a city policy does exist, are insufficient."). Here, for the reasons explained below, the evidence in the record is insufficient to raise a genuine issue of material fact regarding whether the City was deliberately indifferent in failing to train its police officers as to the proper use of tasers.

As noted above, Plaintiff could prove deliberate indifference on the part of the City by showing either the "(1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger*, 434 F.3d at 1029-30. In his brief, Plaintiff focuses the Court on the first method of proof.[12] Again, Plaintiff takes no issue with the City's written Taser Policy. Instead, according to Plaintiff, "[t]he problem for the City is that it completely failed to adequately train

---

[12] As there is no evidence before the Court to suggest that the City received *any* complaints (apart from Plaintiff's) about its police officers' use of tasers, Plaintiff's decision to rely only on the first method of proof identified by *Sornberger* appears to be well advised.

its officers on that policy, which led directly to the use of the tasers on [Plaintiff] in the instant case." (Pl. Mem. at 8).

There is nothing fundamentally wrong with Plaintiff's legal theory: If a municipality placed a dangerous weapon such as a taser in the hands of its police officers without any training whatsoever and then sent them out on the streets, it is entirely foreseeable that the tasers would be misused and the municipality could be liable for any resulting injuries. But the problem for Plaintiff is that he identifies nothing about the training regimen that the City employed that supposedly fails to pass constitutional muster. For example, Plaintiff does not present evidence purporting to show that an eight-hour initial training is too short, that Lieutenant Garrison's lessons were defective in some way,[13] or that yearly recertification is too infrequent. Compare *Sornberger*, 434 F.3d at 1030 (reversing grant of summary judgment for defendant municipality and noting testimony in the summary judgment record of criminologist who concluded, based on his review of complaints lodged against the municipality, that the police department "has been deliberately indifferent to a pattern of use of coercive threats, including threats to misuse DCFS, by its officers") with *Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997) (setting aside jury verdict for plaintiff against municipality and noting the absence of any "expert testimony which questioned the adequacy of a municipal police department's procedures"). Instead, Plaintiff's <u>only</u> evidence that the City's training regimen was deficient is that Defendant Officers did not follow the Taser Policy when they arrested Plaintiff and appeared ignorant of the content of the Policy when asked about it during their depositions. Plaintiff essentially argues that that the "proof is in the pudding"—that the City's training regimen *must have been* deficient because Defendant Officers gave inconsistent (and incorrect) answers about the Policy during their

---

[13] In fact, the record is devoid of specific evidence about what Lt. Garrison taught Country Club Hills Police Officers during the taser training.

depositions.

This method of proving up a deficient training program has been squarely rejected by the Supreme Court: "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390. Defendant Officers' actions during Plaintiff's arrest and their answers during their depositions suggest that each was indeed confused about what the City's Taser Policy actually was. But there is no evidence in the record to show that a faulty training regimen was the "moving force" behind this confusion. Instead, "it may be, for example, that an otherwise sound program has occasionally been negligently administered," *id.* at 391, or that Defendant Officers were exceptionally poor students. As the Seventh Circuit has held, "[a] particular officer's unsatisfactory training cannot alone suffice to attach liability to the state," for "[a]n officer's faults * * * may result from factors other than the deficient training program" and "[e]ven adequately trained officers sometimes err, and such error says little about their training program or the legal basis for liability." *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989) (citing *City of Canton*). In essence, Plaintiff asks the Court to *assume* that Defendant Officers' failure to adhere to their employer's directions was directly caused by some flaw in their training. Making such an assumption would be directly contrary to the heightened standard of causation required by *City of Canton* and its progeny.[14] See *Graham v. Sauk Prairie Police Com'n*, 915 F.2d 1085, 1100 (7th Cir. 1990) (observing that *City of Canton* "formulated a

---

[14] The only other fact offered by the Plaintiff in support of his claim against the City is that at some unspecified time after the events of May 29, 2004, the City discontinued the use of tasers by its police officers. Plaintiff does not explain how this fact bears on the adequacy of the City's training program during the time that tasers were in use.

stringent standard for plaintiffs to satisfy in order to establish municipal liability").

Plaintiff relies on *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006), but that case underscores Plaintiff's failure to adduce the type of evidence required to raise a genuine issue for trial regarding whether a municipality's training program was so deficient as to constitute deliberate indifference. In *Sornberger*, the plaintiff sought to establish that the defendant city had a policy of coercing confessions out of female suspects by threatening to have DCFS take away their children. *Id*. The Seventh Circuit concluded that the plaintiff had raised a triable issue with respect to whether the city failed to provide adequate training by pointing to deposition testimony in the record that showed that an arresting officer affirmatively believed that an unconstitutional practice was consistent with the City's policies. Here, Defendant Officers were in agreement that the City prohibited them from using the tasers in a clearly unconstitutional manner (for example, Defendants Officers all testified that tasering a fully subdued or handcuffed suspect would be prohibited). That Defendant Officers were unsure about the specifics of the written Taser Policy (for example, Defendants were unclear about whether the taser came before or after the use of pepper spray on the use of force spectrum) does not necessarily raise a question as to whether their training was constitutionally deficient. See *Quade v. Kaplan*, 2008 WL 905187, at *15 (N.D. Ill. March 31, 2008) (citing *Sornberger*, 434 F.3d at 1030). "After all, in almost every instance where a § 1983 plaintiff has suffered a violation of his constitutional rights by a government employee the plaintiff can point to something that the government could have done to protect against that unfortunate incident." *Erwin*, 872 F.2d at 1298. And, here, the Defendant Officers remain in the case to answer for their conduct at trial. But even if the officers "could have done a much better job handling" the circumstances giving rise to Plaintiff's lawsuit, summary judgment for the City remains proper

because Plaintiff "fails to identify any meaningful systemic problem with the way in which [the officers] [we]re trained." *Rome v. Meyers*, 353 Fed. Appx. 35, 37 (7th Cir. Nov. 20, 2009) (unpublished decision).

Plaintiff's remaining arguments amount to an attempt to impose *respondeat superior* liability on the City of Country Club Hills. A listing of the policies broken, for example, does not help Plaintiff establish that *deficient training* caused Plaintiff's rights to be violated. Because Plaintiff has pointed to nothing in the record demonstrating that the City of Country Club Hills' training program was itself deficient, the Court grants summary judgment in favor of the City of Country Club Hills on Count I.

### B. Medical Care

Plaintiff's second claim involves the medical care that Plaintiff received (or rather, did not receive) once he arrived at the police station. (Pl. Resp. at 13-14). Plaintiff argues that the lack of medical training provided by the City constitutes a deliberate indifference towards the medical needs of tased offenders. (*Id.*). Pointing to his deposition testimony, Plaintiff's evidence in support of this claim rests upon the fact that the taser prong remained in his arm during the ride to the station and because he was not offered medical assistance once he arrived. (*Id.*).

Plaintiff's argument is inconsistent with the basis for imposing municipal liability under *Monell*, which is limited to cases where the injury was *caused by* an official municipal policy or custom. *Monell*, 436 U.S. at 694. Here, Plaintiff offers no evidence regarding the medical training that the City provided to its police officers or evidence of deficient training practices. Similarly, Plaintiff does not provide evidence of a pattern of similar incidents of insufficient care. The record is devoid of any evidence from which the Court could infer that the City had an

informal policy of ignoring the medical needs of arrestees. Plaintiff cites no authority to support his apparent position that a single incident of allegedly deliberate indifference to Plaintiff's injuries is itself sufficient to raise an issue for trial regarding the existence of a municipal policy of ignoring the medical needs of tased individuals.

In his brief, Plaintiff focuses on the elements needed to prove deliberate indifference to medical needs by *individual* prison officials. (See Pl. Resp. at 14 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835–36 (1994)). The cases cited by Plaintiff combined with the evidence adduced plainly does show an issue for trial regarding whether the *Defendant Officers* provided Plaintiff with constitutionally deficient medical care (in fact, the City admits as much in its reply brief (Def. Reply [77] at 2)). However, because Plaintiff has failed to adduce any evidence showing that the City's policy caused Plaintiff to receive deficient medical treatment at the hands of the Defendant Officers or any other members of the City police force, summary judgment on Count II for the City of Country Club Hills is warranted.

C. **Indemnification**

Finally, with respect to Count III, which seeks indemnification from the City pursuant to 745 ILCS 10/9-102, the City argues only that "to the extent that plaintiff claims entitlement to indemnification [* * *] from the City of Country Club Hills for a judgment entered against one or more of the individual defendants for punitive damages" any such claim is impermissible under the law. (Def. Mem. at 13 (citing *City of Newport v. Fact Concerts*, 453 U.S. 247, 265 (1981)); see also *Minix v. Canarecci*, 597 F.3d 824, 829 (7th Cir. 2010) ("municipalities are immune from punitive damages in § 1983 suits"). In his response, Plaintiff agrees that any indemnification of Defendant Officers by the City of Country Club Hills would not extend to any

award of punitive damages. (Pl. Resp. at 14). Accordingly, the Court grants summary judgment with respect to this aspect (and this aspect only) of Count III.

## IV. Conclusion

For the foregoing reasons, Defendant City of Country Club Hills' motion for summary judgment [60] is granted as to Counts I and II, and to the part of Count III discussed above.

Dated: March 24, 2011

_____
Robert M. Dow, Jr.
United States District Judge